IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PATRICIA A. GARCIA-LOGUE,

       Plaintiff,

vs.                                     No. CIV 06-1018 WJ/LFG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

       Defendant.

**MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION**[1]

    Plaintiff Patricia A. Garcia-Logue ("Garcia-Logue") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). On a "continuing disability review," the Commissioner determined that Garcia-Logue's disability ceased as of April 1, 2000 and that she is no longer eligible to receive supplemental security income ("SSI") benefits.

    Garcia-Logue initially challenged only the ALJ's finding as to her mental impairment. Between the time she filed the opening brief and the time her reply was filed, Garcia-Logue changed counsel. The new attorney identified an additional issue which had not been raised in the opening brief, and Garcia-Logue now challenges the finding as to her physical impairment as well. Defendant was permitted to file a surreply on the newly-raised issue.

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

Garcia-Logue asks the Court to reverse the Commissioner's final decision and order reinstatement of benefits or, in the alternative, to remand to the Commissioner for a rehearing.

**Procedural Background**

On March 22, 1993, Garcia-Logue was found to be disabled within the meaning of the Social Security Act, with an onset date of March 16, 1992, due to back and leg problems.  (Tr. 260-265).  Although Garcia-Logue also claimed a mental impairment at that time, the Administrative Law Judge ("ALJ") Harold L. Neufeld found that her depression, substance abuse problem, and suicidal gestures were in remission and under control, and he found that her psychiatric impairments did not impact on her residual functional capacity at that time.  (Tr. 264).

Thereafter, the Commissioner began a continuing disability review ("CDR") of Garcia-Logue's case pursuant to 20 C.F.R. § 416.989, which provides as follows:

> After we find that you are disabled, we must evaluate your impairment(s) from time to time to determine if you are still eligible for payments based on disability. We call this evaluation a continuing disability review. We may begin a continuing disability review for any number of reasons including your failure to follow the provisions of the Social Security Act or these regulations . . . .  If this review shows that we should stop your payments, we will notify you in writing and give you an opportunity to appeal.

On November 5, 1999, the Commissioner determined that Garcia-Logue's SSI benefits should cease because she failed to appear for consultative medical examinations.  (Tr. 268-272).  Garcia-Logue administratively appealed this decision, and a hearing was held on May 31, 2000.  (Tr. 291).  Hearing Officer John Bishop considered Garcia-Logue's medical and other evidence and issued a decision on June 15, 2000, finding that Garcia-Logue's leg and back condition had improved sufficiently that she would be able to return to work.  (Tr. 291-297).

2

With respect to her alleged mental impairment, the hearing officer found that Garcia-Logue did not have severe emotional or mental limitations.  He noted that Garcia-Logue stopped using drugs in 1992 after she was hospitalized for an overdose of cocaine, an apparent suicide attempt.  By the time of the ALJ hearing, she was "clean and sober" and attending meetings of Alcoholics Anonymous. She was counseling prisoners and others through her church.  She was singing, writing songs and playing the piano, as well as studying to be a sales representative for prepaid legal services.  Hearing Officer  Bishop noted further that he "observed claimant related well and demonstrated a full range of emotion from crying to laughter, at appropriate times" (Tr. 292), that she was hopeful for the future, and that she got along well with her daughter.  The hearing officer also pointed to a consultative psychiatric evaluation performed by psychiatrist Rene Gonzalez, MD on July 6, 1999, wherein Dr. Gonzalez concluded that Garcia-Logue had the emotional capacity to handle a job and to relate well to other people.  (Id.).

Garcia-Logue appealed the hearing officer's decision and requested a hearing before an ALJ. (Tr. 299).  The hearing was held on April 19, 2001 before ALJ Gerald R. Cole.  (Tr. 569-602).  On August 20, 2001, the ALJ issued his decision (Tr. 69-82), concluding that Garcia-Logue's disability ceased beginning April 2000.  (Tr. 73).  ALJ Cole found that Garcia-Logue's condition had improved enough that she was able to do simple, unskilled work at a limited light exertional level.  (Tr. 79). He found that her back condition and depression constituted severe impairments (Tr. 81), but that she nevertheless retained the residual functional capacity as described.  (Tr. 82).

The Appeals Council on May 18, 2002 denied Garcia-Logue's Request for Review of the ALJ's decision, and she appealed to United States District Court.  On April 17, 2003, United States Magistrate Judge Richard L. Puglisi remanded the case back to the Commissioner.  (Tr. 653-668);

3

Garcia v. Barnhart, Civ. No. 02-800 RLP (D.N.M.  Apr. 17, 2003) [Docs. 15, 16].  Judge Puglisi found no error in the ALJ's framing of the hypothetical with regard to Garcia-Logue's mental impairment.  However, he remanded for a new hearing with respect to exertional limitations, finding that the ALJ had not adequately explained why he rejected the consulting physician's opinion as to Garcia-Logue's sitting capacity and accepted instead the opinion of a non-examining agency physician on this issue.  Judge Puglisi remanded the case "with instructions to conduct additional proceedings at step seven . . . to include presenting to a vocational expert, hypothetical questions that relate with precision all of the Plaintiff's impairments."  (Tr. 668).

On remand, the case was assigned to ALJ David R. Wurm who held a hearing on March 29, 2004.[2]  (Tr. 733-755).  On December 22, 2004, ALJ Wurm issued his decision.  (Tr. 620-633).  He found that  Garcia-Logue's disability ceased as of April 1, 2000 and that she has not been disabled at any time since that date. In particular, the ALJ found that Garcia-Logue's exertional impairment involving her spine and leg had improved sufficiently that she was no longer disabled by these conditions.

One step in the CDR process requires the ALJ to refer to the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, App. 1, and determine whether any of the claimant's impairments meets or exceeds a listed impairment.[3]  ALJ Wurm examined two sections of the Listings: 12.04 concerning affective disorders, and 12.09 concerning substance addiction disorders.  He reviewed the record, including Dr. Rene Gonzalez's consultative psychiatric examination of 1999, Garcia-Logue's record

---

[2]ALJ Gerald Cole passed away in the interval between his decision and the Court's remand for additional proceedings.

[3]The seven-step sequential evaluation process of determining whether a disability continues is discussed in further detail below.

of treatment with a psychiatric social worker, her history of alcohol-related medical problems, and other medical records for the applicable time period. He held that Garcia-Logue's condition did not meet any of the Listings. (Tr. 625-626).

ALJ Wurm went through the rest of the steps in the sequential evaluation process (as set forth below), and concluded that Garcia-Logue's impairment due to alcohol abuse was severe, but that her impairment due to depression was not severe. He further found that if Garcia-Logue were to stop using alcohol, she would be capable of performing light exertional level work. He therefore concluded, under 20 C.F.R. § 416.935, that Garcia-Logue is not currently disabled and that her disability ceased as of April 1, 2000. (Tr. 627-631).

Garcia-Logue now appeals that ruling, arguing that the ALJ failed to develop the record concerning her mental impairment. She also contends that the decision to deny benefits was not supported by substantial evidence, because the ALJ ignored Garcia-Logue's anxiety disorder and failed to follow the proper procedures for evaluating mental impairments, including preparation of a Psychiatric Review Technique form. (Doc. 14).

As noted above, Garcia-Logue added a new argument in her reply brief, addressing her asserted physical impairment. She contends that ALJ Wurm failed to comply with Judge Puglisi's directive to "relate with precision all of Plaintiff's impairments" in formulating a hypothetical question to the VE on remand. Defendant requested and received Court permission to file a surreply addressing the new contention, and the Court finds it appropriate to consider this issue.

## Discussion

### The Seven-Step Procedure for Determining if Disability Continues

The sequential evaluation procedure for determining whether an SSI claimant's disability

continues is set forth in 20 C.F.R. § 416.994(b)(5).  That section provides that the following steps be taken:

First, the ALJ must determine whether the claimant currently has an impairment or combination of impairments which meets or exceeds the severity of a listed impairment.  If so, she will be found to have a continuing disability.

If not, the ALJ then goes to Step 2, which requires a determination of whether there has been "medical improvement," defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled . . . ."  20 C.F.R.  § 416.994(b)(1)(i).  If there has not been any medical improvement, then the claimant's disability continues.  In this case, Garcia-Logue's "most recent favorable medical decision" was the March 22, 1993 determination that she was eligible for disability benefits.  (Tr. 260-265).

If there has been medical improvement, the ALJ goes to Step 3, which requires him to determine whether the improvement is "related to" the claimant's ability to do work; that is, whether there has been an increase in the residual functional capacity ("RFC") based on the impairments that were present at the time of the most recent favorable medical determination.  If the improvement is not "related to" the claimant's ability to do work, the ALJ goes to Step 4, which is not applicable in Garcia-Logue's case.

If the medical improvement *is* related to the ability to do work, then the ALJ goes to Step 5.  Here, the ALJ must decide whether all of the current impairments, in combination, are "severe," that is, whether the impairments significantly limit the claimant's physical and mental abilities to do basic work activities.  If the combined impairments are not severe, the claimant is considered no longer disabled.

6

If the impairments are severe, the ALJ then goes to Step 6, which requires him to assess the claimant's RFC based on all current impairments and consider whether claimant can still do the work she has done in the past.  If she can, the disability ceases.

If she cannot do her past work, the ALJ then goes to Step 7.  At this point, the ALJ must decide whether the claimant can do other work existing in the national economy, considering her RFC, her age, education and past work experience.  If she can do other work, the disability ends; if not, the disability continues.

<u>Plaintiff's Claims on Appeal</u>

With respect to her mental impairments, Garcia-Logue claims that the ALJ erred in the following ways:

(1) She faults the ALJ's analysis at Step 1, arguing that he did not consider her anxiety disorder under 12.06 of the Listings in making the determination that her mental impairment did not meet or exceed any of the Listings.

(2) She also contends that the ALJ erred in failing to prepare a Psychiatric Review Technique ("PRT") form.

(3) Garcia-Logue further argues that the ALJ's finding concerning Garcia-Logue's mental impairment is not supported by substantial evidence in that he: (a) did not properly consider the objective symptoms concerning her anxiety disorder, (b) failed to develop the record regarding her manic behavior and delusional thinking and the effect these conditions would have on her ability to work, and (c) ignored evidence that Garcia-Logue does not have the emotional ability to perform work on a sustained, ongoing basis.

With respect to her physical impairments, Garcia-Logue contends that the ALJ erred in failing to propose a specific hypothetical question to the VE which assumed an inability to sit for more than four hours in a work day, thus violating the specific directive in Judge Puglisi's order of remand that the ALJ pose a hypothetical which "relates with precision all of Plaintiff's impairments."

The Court will first discuss Plaintiff's contentions with respect to her mental impairments, then will address the newly-raised contentions regarding her physical impairments.

I.

Mental Impairments

The Court finds no error in the ALJ's handling of Garcia-Logue's contentions surrounding her mental impairments.

A.   The ALJ's Consideration of Anxiety Disorder

Garcia-Logue asserts that the ALJ should have performed an analysis under section 12.06 of the Listings, which deals with anxiety disorders, and that his failure to do so requires reversal.

The ALJ stated in his opinion that he had "given careful attention to section 12.04 concerning affective disorders and section 12.09 regarding substance abuse disorders." (Tr. 625). He did not specifically mention section 12.06; however, he reviewed Garcia-Logue's medical records relating to her mental impairment and found conflicting statements from doctors as to the existence of an anxiety disorder.

In particular, he noted that Garcia-Logue had been seen by a licensed social worker for four sessions in March-April 2001, and that at the first session this provider diagnosed her with anxiety disorder with agoraphobia, and major depression.[4] (Tr. 626, referring to the session with Claudia J. Johnson at Tr. 459). However, the ALJ noted further that at the last session with Ms. Johnson, Garcia-Logue reported that she was making public singing appearances at her church and at a professional sporting event. In addition, the ALJ stated that Garcia-Logue's primary care physician, Dr. Donald Lacy, indicated in November 1999 that Garcia-Logue did not suffer from a mental or

---

[4]Agoraphobia is the fear of being in large open spaces, in crowded spaces, or away from the safety of home. Dorland's Illustrated Medical Dictionary 41 (26th ed. 1981).

8

nervous impairment, and that in an office note dated October 9, 2000 Dr. Lacy wrote that Garcia-Logue was using anti-anxiety medication and reported no anxiety or depression.  (Tr. 626, referring to Tr. 383, 492).

The ALJ did, in fact, consider the record evidence of an anxiety disorder but implicitly found that there was insufficient evidence of such a diagnosis to cause him to examine the specific Listing for anxiety disorders.  Section 12.06, Anxiety Related Disorders, is satisfied if "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

The required level of severity is met under Section 12.06 if the record reveals medically documented findings of at least one of the following:

> 1.  Generalized persistent anxiety accompanied by three out of four of  the following signs or symptoms: a. Motor tension; or b. Autonomic hyperactivity; or c. Apprehensive expectation; or d. Vigilance and scanning; or

> 2.  A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

> 3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

> 4.  Recurrent obsessions or compulsions which are a source of marked distress; or

> 5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

20 C.F. R. Pt. 404, Subpt. P, App. 1, § 12.06(A).

In addition to these findings, the record must also show that these symptoms result in at least two of the following: (1) marked restriction in activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration. Alternatively, the Listing is met if the symptoms result in complete inability to function independently outside the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B).

The record shows little or no evidence of the symptoms noted above. Garcia-Logue has not reported or exhibited "generalized persistent anxiety," an irrational fear of a specific object or situation, recurrent severe panic attacks, recurrent obsessions, or recurrent and intrusive recollections of a traumatic experience which are a source of marked distress. She has not pointed to any part of the record where such symptoms have been documented, at the level of severity described in § 12.06.

The record with respect to Garcia-Logue's symptoms of anxiety is as follows:

In January 1999, Garcia-Logue reported depression, but no anxiety. (Tr. 391). In June 1999, she presented to the emergency room complaining of throat pain and shortness of breath, in addition to swelling of the face and neck. (Tr. 359-360). She smelled of alcohol and admitted to excessive alcohol intake over the preceding several weeks. The examining doctor listed "anxiety" as part of his diagnosis. With respect to this, he wrote: "The patient had significant anxiety and distress while she was in the Emergency Room. She was given 1 mg. of Ativan [an anti-anxiety medication] and had actually had [sic] significant relief from the distress and was feeling much, much better at this time. I suspect that the alcohol use probably does not help at all, and probably makes her anxiety somewhat worse." (Tr. 361).

The consultative examination by psychiatrist Dr. Rene Gonzalez took place on July 6, 1999.

At that time, Dr. Gonzalez noted that Garcia-Logue complained of feeling anxious, among other things. The doctor also noted that Garcia-Logue found her boyfriend dead from an overdose of cocaine, "and this has caused her some difficulty," including depression and sleep problems. (Tr. 369). Dr. Gonzalez found symptoms of depression but did not note anxiety in her diagnosis. (Tr. 369-372).

In August 1999, Garcia-Logue's doctor noted that she had an adjustment disorder with anxiety, "secondary to assault," as she reported having been mugged a few weeks earlier. (Tr. 499). In November 1999, her primary care physician filled out a disability insurance claim form on Garcia-Logue's behalf, describing her physical impairments, but noting "N/A" (presumably meaning "not applicable") under the category "Mental/Nervous Impairment" (Tr. 383) In June 2000, her doctor noted that Garcia-Logue had stopped using alcohol five months earlier and felt "great" at that time. (Tr. 497). In July 2000, Garcia-Logue asked the doctor for a refill of Xanax, which "helps her nerves." (Tr. 495). On October 9, 2000, she told her doctor she was feeling well and had no anxiety at that time. She was taking another anti-anxiety medication, which worked to control her symptoms. (Tr. 492).

In March and April 2001, Garcia-Logue was seen by Claudia J. Johnson, a social worker. On March 22, 2001, Therapist Johnson noted that Garcia-Logue's speech was rapid, pressured and loud. Garcia-Logue reported to Johnson that she had been having panic attacks; she also reported anxiety and excessive worry. (Tr. 454-455). Johnson's initial diagnosis on that date included "Anxiety Disorder and Agoraphobia." (Tr. 459). At a second visit on March 27, the therapist again noted excessive anxiety, characterized by pressured and rapid speech. (Tr. 460). At a visit on April 5, Garcia-Logue still appeared very anxious, but she reported to the therapist that she was working on

11

decreasing her level of stress by learning to relax and engaging in activities that gave her pleasure. (Id.). On the last reported visit with Ms. Johnson on April 13, 2001 Garcia-Logue stated that she was doing a lot of singing at church as well as at professional athletic events, and that she was resting more and feeling better. (Tr. 461). There was no indication of anxiety at this visit, and no indication that Garcia-Logue had any further treatment with Ms. Johnson.

On July 31, 2001, Garcia-Logue was assessed at a Behavioral Pain Management clinic. The medical care provider noted that she had some stressors in her life, including sexual abuse as a child and a sexual assault in 1995. (Tr. 15). She was noted to be sitting in a rather stiff posture, and she appeared tense and anxious. She reported anxiety in the form of post traumatic stress associated with the life events described above. The provider noted that Garcia-Logue was receiving regular psychotherapy treatments at that time. The record does not appear to support that statement but, in any event, the provider encouraged Garcia-Logue to continue with the assumed ongoing psychotherapy treatments and noted that she "probably can benefit from as much support in a psychosocial sense as can be provided to her and she's encouraged to continue to utilize her friends and family and other support systems that may be available to her as well." (Tr. 16). No return visit was scheduled. (Tr. 17).

On December 26, 2001, Garcia-Logue presented to the ER at Lovelace Health Systems with complaints of chest tightness and anxiety. She reported increased stressors in her life, including three deaths in the family within the space of month. (Tr. 30-34).[5] She was referred for an appointment with a counselor the following day at Lovelace Behavioral Health. (Tr. 34, 29). There is no record

---

[5]The record of another ER visit, bearing the date January 3, 2002, appears to actually be referring to the same occasion as the one reported at Tr. 30-34. It is probable that the physician typed up her notes on January 3, 2002 and put an incorrect date for date of service. *See* Tr. 28-29.

of a visit to Behavioral Health on December 27, 2001 (nor on January 4, 2002; see footnote 3).

On April 7, 2003, Garcia-Logue was again seen in the ER, complaining of a large bruise from the buttock extending down the thigh. She told the doctor it may have been caused by sitting on her foot for long periods while playing the guitar. The doctor noted that she was "smiling and looks well." There was no indication of anxiety at this visit. (Tr. 729-730).

The next day, on April 8, 2003, Garcia-Logue presented to the ER at University of New Mexico Hospital ("UNMH") with complaints of difficulty breathing, stabbing chest pain, and anxiety. She had a generalized seizure while there, and she was admitted to the hospital with suspected alcohol withdrawal symptoms. A CT scan showed mild volume loss in the brain but no evidence of an intracranial hemorrhage or mass. (Tr. 687, 694). She was diagnosed with seizures and alcohol withdrawal. (Tr. 689, 693-694). Garcia-Logue told the doctor that she had a history of seizure disorders; however, her mother, who accompanied her to the ER, told the doctor that Garcia-Logue never had seizures before.[6] Garcia-Logue also said that her back injury was caused by a gun shot wound to the lower back which she received while working as an undercover police officer. (Tr. 689). At this time, Garcia-Logue was taking Xanax three times a day for anxiety. (Id.). The doctor kept Garcia-Logue on Ativan and took her off of Xanax. He ordered a psychiatric consultation. (Tr. 691).

During this hospitalization, in addition to the seizure, Garcia-Logue had significant *delirium tremens*. At one point, she became severely agitated and had to be held down by "all the nursing staff plus three security guards," after which she was put in restraint for her safety. (Tr. 683). She was

---

[6]Garcia-Logue also told ALJ Wurm at the hearing on March 29, 2004 that she'd been having seizures since she was a little girl. (Tr. 747, 748, 754). As noted above, Garcia-Logue's mother says this is not true.

treated for this with potassium replacement therapy, Ativan and morphine.  (Id.).  She was kept in the hospital for about eight days and was eventually discharged in the care of her mother, with a referral to an addiction treatment program.  (Tr. 683-684).

On September 20, 2003, Garcia-Logue was treated at the SANE Collaborative after she was raped by an acquaintance.  (Tr. 696-712).  She expressed anxiety about being alone after this event. (Tr. 708).

On October 7, 2003, Garcia-Logue was again admitted to UNMH for observation and treatment following an alcohol-withdrawal seizure.  She stated she had been drinking heavily for two weeks.  (Tr. 723-728).  Her physician noted that at one point during her hospitalization, she required 56 mg of Ativan (an anti-anxiety and anticonvulsant medication) to keep her calm, as she was thrashing against her restraints.  (Tr. 723).  She remained in the hospital overnight.  A week later, on October 14, 2003, she returned to the Family Practice Clinic for a follow-up visit, at which time she reported that she was doing well, overall.  (Tr. 721).

Garcia-Logue was seen again at UNMH on November 26, 2003.  At this time, she reported that she had been nauseated and vomiting for five days and that she had almost daily seizure activity over the preceding month.  (Tr. 718).  She told the doctor that, after her discharge from the hospital in October, she used alcohol again recently on approximately three occasions, each time drinking "as much as I could."  (Id.).  She said she thought that her nausea and seizures were aggravated by a rape that occurred in September 2003.  She reported daily flashbacks and nightmares surrounding the rape incident.  The doctor was concerned that the seizure activity might be the result of a brain lesion, and he scheduled an MRI.  (Id.).  The MRI was performed on January 5, 2004.  It showed some scattered changes in the brain tissue, more than would be expected for her age, but no lesion was evident.  (Tr.

715-716).

As noted above, the record establishes that Garcia-Logue has had some very difficult experiences in her life.  Neither side questions that she suffered a severe back injury which required several surgeries.  Her now ex-husband is accused of sexually molesting one of her daughters.  (Tr. 222, 237, 455, 690).  On one occasion, Garcia-Logue reported that three of her family members died in one month.  (Tr. 28).  She reported being raped or sexually assaulted on two separate occasions.  (Tr. 15, 455, 696-712, 718).  On another, she reported having been mugged.  (Tr. 499).  She says that in 1998, she discovered the body of her boyfriend or fiancé, who died of an overdose.  (Tr. 369, 458).

All of these experiences are traumatic and undoubtedly would have adversely affected her.  Any person would understandably suffer stress and anxiety in reaction to such occurrences.  However, as Respondent points out, situational anxiety for a limited period does not establish a mental disability.  This is so even if these traumatic events occurred serially or in combination with one another.  Even a diagnosed mental condition does not establish the existence of a disabling impairment, unless the condition produces functional limitations which render the claimant unable to work.  Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988).  The record does not support Garcia-Logue's argument that she had an anxiety disorder which significantly limited her ability to work.

While there are specific references to anxiety documented in the record, Garcia-Logue's symptoms, even serious as they are, fall far short of meeting the specific requirements of Listing 12.06 which, as noted above, requires evidence of generalized persistent anxiety accompanied by at least three of the following:  motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning; or persistent irrational fear of a specific object or situation; or recurrent severe panic

attacks occurring at least once a week; or recurrent obsessions or compulsions which cause marked distress; or recurrent or intrusive recollections of a traumatic experience which cause marked distress. The record does not contain medically documented findings of any of these sets of symptoms.

Rather, it appears that Garcia-Logue's anxiety generally appears sporadically and in response to anxiety-producing situations. Situational anxiety such as this is not a disabling condition. In addition, the record indicates that medication provides Garcia-Logue significant relief from her anxiety and "nerves." Her documented seizures were caused by alcohol withdrawal; any anxiety Garcia-Logue experiences regarding her seizures is therefore a direct outcome of her alcohol abuse.

While the Court sympathizes with the great life stressors Garcia-Logue has experienced, the Court finds no error in the ALJ's analysis of Garcia-Logue's anxiety symptoms.

B. Failure to Prepare a Separate Psychiatric Review Technique Form

Next, Garcia-Logue argues that the ALJ failed to follow the correct procedures for evaluating mental impairments, including the preparation of a Psychiatric Review Technique form. In this case, the ALJ did not attach a PRT form to his opinion. Garcia-Logue asserts that this was reversible error.

Current regulations require that, when mental impairments are at issue, the ALJ must perform a psychiatric review using the technique set forth in 20 C.F.R. § 416.920a. Although former regulations required that the ALJ attach a copy of the PRT form to his opinion, that is no longer the case. *See*, Selassie v. Barnhart, 203 Fed. Appx. 174, 176 (9th Cir. 2006). Now the ALJ may document application of the technique in the body of the decision itself; the ALJ need not fill out a separate PRT form. Id.; 20 C.F.R. § 416.920a(e); Branum v. Barnhart, 385 F.3d 1268, 1272-73 (10th Cir. 2004).

16

To fulfill the requirement that the "special technique" for evaluation of a mental impairment is documented in the body of the opinion, the ALJ must do the following:

> the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

"Paragraph (c)," referred to in the above-quoted section, requires that the ALJ rate the claimant's degree of functional limitation in four broad areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The first three functional areas are to be rated on a five-point scale ranging from none, to mild, moderate, marked, and extreme. The fourth functional area, episodes of decompensation, is to be rated on a four-point scale: none, one or two, three, and four or more.  20 C.F.R. § 416.920a(c)(3),(4).

In this case, the ALJ's application of the psychiatric review technique is adequately documented in the body of his opinion. While he could have been more explicit in designating this portion of the opinion as an application of the "special technique" of PRT, it is clear that the ALJ carefully considered the appropriate functional areas when he wrote:  "Specifically, she has no restriction of activities of daily living; no difficulties in maintaining social functioning; mild deficiencies of concentration, persistence or pace; and, no episodes of decompensation . . . ."  (Tr. 626).

The "special technique" is aimed at determining the degree of the claimant's functional

limitation based on the extent to which her impairment interferes with her ability to function independently, appropriately, effectively, and on a sustained basis.  20 C.F.R. § 416.920a(c)(2).  In making this determination, the ALJ is required to "consider all relevant and available clinical signs and laboratory findings, the effects of [claimant's] symptoms, and how [claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment."  20 C.F.R. § 416.920a(c)(1).

The ALJ did a thorough review of the record as it pertains to Garcia-Logue's mental impairments, including the effect of treatment and medications on her symptoms of depression and anxiety (as will be treated in more detail below under the discussion of whether the ALJ's conclusion is supported by substantial evidence).  The ALJ appropriately rated the degree of functional limitation caused by Garcia-Logue's mental impairments in each of the four specified areas and concluded that in spite of these impairments Garcia-Logue retains the RFC to perform a full range of light exertional work, when she is not using alcohol.

The Court finds that the ALJ did not commit reversible error by failing to attach a PRT form to his decision, and that he appropriately documented the special technique in the body of his opinion.

 C. <u>Record Support for the ALJ's Finding that the Disability Ceased</u>

Finally, Garcia-Logue argues that the record does not support the ALJ's ultimate finding that her mental impairment is not disabling.  Specifically, she contends that the ALJ did not properly consider the objective symptoms concerning her anxiety disorder, failed to develop the record regarding her manic behavior and delusional thinking and the effect these conditions would have on her ability to work, and ignored evidence that Garcia-Logue does not have the emotional ability to perform work on a sustained, ongoing basis.

18

1.  *Anxiety Disorder*

Garcia-Logue contends that the ALJ did not properly consider the objective symptoms of her anxiety disorder.  There are indications on the record that Garcia-Logue has exhibited symptoms of anxiety, on some occasions.  However, as discussed above, the anxiety symptoms are usually described by her medical care providers as occurring in connection with specific stressful life events, rather than as a chronic condition.  The record also indicates that her symptoms are reduced or eliminated by anti-anxiety medications.

As discussed earlier, the ALJ considered the evidence and concluded that Garcia-Logue's symptoms of anxiety are not disabling.  The Court finds no error in the ALJ's handling of this issue.

2.  *Failure to Develop the Record*

Garcia-Logue contends that the ALJ failed in his duty to develop the record regarding her alleged mental impairments of bipolar disorder and delusional thinking.  Counsel points to several pieces of evidence in the record which, he contends, demonstrate Garcia-Logue's delusional and grandiose comments.  He argues that the ALJ relied on these claims as evidence that Garcia-Logue could engage in activities suggesting the ability to perform work but, at the same time, failed to consider the delusional nature of the claims as evidence of a mental impairment.  Counsel argues also that the ALJ misstated certain factual matters in reliance on these allegedly delusional claims, which indicates a failure to carefully review the record.

For example, the record clearly shows that Garcia-Logue's back injury which led to her surgeries was sustained when she attempted to lift a heavy box at work.  However, when she was hospitalized in April 2003 for alcohol withdrawal seizures, she told the ER physician that her back injury occurred when she was shot in the line of duty as an undercover police officer.  (Tr. 689).  In

describing Garcia-Logue's back injury, the ALJ stated, "She has a history of a lower back injury with a degenerated disc at L4-5 and L5-S1 sustained in the 1980's (the injury has been attributed variously to lifting a heavy box in 1988 or a gunshot wound in 1985), for which she ultimately required three surgeries." (Tr. 624-625).

The Court agrees that Garcia-Logue's statement that she sustained a gunshot wound in the line of duty as a police officer is not supported by the record. There is no evidence that Garcia-Logue ever worked as a police officer. The record indicates only that she may have applied for a job with the Albuquerque Police Department in 1984, and that she told a therapist in 1992 that she once attended the Police Academy but never graduated. (Tr. 236, 468). There is no record support for this representation, nor is there evidence demonstrating that Garcia-Logue served as an undercover police officer or was shot in the line of duty.

While the ALJ may have overstated the case in giving equal billing to Garcia-Logue's assertion of a gunshot wound vis à vis the box-lifting incident, it was not inaccurate for the ALJ to state that the cause of her back injury "has been variously attributed" to different types of events. This statement, after all, is fully supported by the record in that Garcia-Logue's back injury has been attributed to various cases. At most, this appears to be an implicit reference to the ALJ's determination that Garcia-Logue is not entirely credible.

Counsel also points to the ALJ's statement that Garcia-Logue has an associate's degree in business administration (Tr. 624), as an example of lack of care in reviewing the record. This statement by the ALJ was indeed erroneous. The ALJ cited to the notes of Claudia Johnson, the social worker/therapist treating Garcia-Logue in March-April 2001, who wrote that Garcia-Logue had a degree from New Mexico State University. (Tr. 458). In addition, a different therapist who

Case 1:06-cv-01018-WJ-LFG   Document 22   Filed 10/15/07   Page 21 of 38


treated Garcia-Logue in 1992, following her suicide attempt in October of that year, wrote in a report that Garcia-Logue had an associate's degree in business and that she attended the Police Academy but did not finish the course.  (Tr. 236).  Presumably, Garcia-Logue told the therapists these things. As counsel points out, Garcia-Logue's transcripts show that she attended Albuquerque T-VI and New Mexico State University, but there is nothing specific to show that she ever earned a degree of any rank.  Indeed, she says herself that she did not graduate from college and did not have a degree in business administration.  (Tr. 99, 587).

While Garcia-Logue's claim that she suffered a gunshot wound in the line of duty as an undercover police officer may qualify as a grandiose or even delusional statement, her exaggeration of her educational background, if that is what she did while talking to her therapists, does not fall within that category.  The ALJ's misstatement that Garcia-Logue earned a college degree may well indicate some lack of care in reading through the record, but the error, if any, is *de minimus*.

The principle thrust of Garcia-Logue's argument here is not only that the ALJ was careless, but also that he used Garcia-Logue's own "grandiose" statements to support the finding that she was capable of performing numerous activities, when in fact he should have used those very statements as indications of a mental disorder.  However, there is no statement in the record from a medical provider which indicates that Garcia-Logue is so mentally unstable as to be delusional.  Exaggeration or self-aggrandizement is not, by itself, proof of a mental disorder.

Counsel points to Garcia-Logue's statements that she performed as a singer at professional games, had a contract with a record company, wrote over 150 songs and had recorded a CD, and that she was studying to work as a salesperson in the prepaid legal services field, as examples of grandiose and delusional thinking.  Counsel says that if Garcia-Logue had in fact sung professionally at athletic

events, or with a record company, her income would have been reflected on her detailed earnings statement.

It is clear that the ALJ questioned Garcia-Logue's credibility.  She contradicts herself at various places in the record.  However, her statements as to singing, songwriting, and guitar playing abound throughout the record, and for all that can be determined from the record she does engage in extensive musical activities.  It is clear that Garcia-Logue is musically talented and that she sings and plays an instrument.  In addition, there is nothing "grandiose" about her statement that she was studying to work in sales for a prepaid legal services company.

The record as to Garcia-Logue's singing and prepaid legal services activities is as follows:

On September 1, 1998, Garcia-Logue told her doctor she didn't like the medication he gave her for back pain because it caused dry mouth, which was a problem for her because she was a singer. (Tr. 393).  On July 16, 1999, she said to her doctor that a treatment (apparently massage) "helps her sing."  She said she had a contract with a record company.  (Tr. 384).

At a consultative physical examination on April 13, 2000, she told the examining doctor that she spent her days reading, singing, writing, volunteering at her church, and visiting the jail to conduct religious meetings with the inmates.  (Tr. 400).

Following a hearing in June 2000, the Hearing Officer reported that Garcia-Logue was playing music, counseling others, and attending AA meetings, among other things.  She also told him that she was studying to be a sales representative for prepaid legal services.  (Tr. 292).  The Hearing Officer's handwritten notes of the hearing show that Garcia-Logue stated she was working toward doing prepaid legal work but that she hadn't made any money at it yet.  (Tr. 282).  The Hearing Officer also noted that Garcia-Logue's testimony as to her physical limitations was not credible, as it was

inconsistent with the extent of her activities.  (Tr. 285).

On September 8, 2000, Garcia-Logue told her doctor that she had been experiencing neck and upper back pain, and that she had not had a specific injury; rather, she had been "working hard on making a CD with her playing the guitar and singing."  She indicated that she might not be available to return for a follow-up visit in 1-3 weeks, as "she is going to promote her CD."  (Tr. 494).

On April 13, 2001, she told therapist Claudia Johnson that her stepfather had been driving her around all week and that she was "singing everywhere I go."  She was feeling better at this point and told Ms. Johnson that she was singing at church and also at a professional game.  (Tr. 461).  Garcia-Logue did not claim that she was paid for these singing activities; indeed, she told the ALJ on April 19, 2001 that the last time she *worked* as a singer in a band was in 1986.  (Tr. 578).

On July 31, 2001, Garcia-Logue told a Behavioral Medicine physician that she "does a lot of journaling and writing songs and plays music and sings songs and has recorded music on a CD that she's about to put together and hopes to at least be able to circulate it to friends and family, although doesn't seem at this point, to feel that she's really ready for doing any kind of commercial work as a singer or artist."  (Tr. 15).  The doctor encouraged her to continue with her singing and other activities but also advised her not to become overly stressed in focusing on professional achievement too soon.  (Tr. 16-17).

On April 7, 2003, Garcia-Logue went to the ER with a large bruise extending from her buttock down her thigh.  She said it may have been caused by sitting on her foot for long periods of time while playing the guitar.  She was given pain medication.  (Tr. 729-730).

In addition to the above notes in the medical record, Garcia-Logue also stated at several places in various Social Security forms that she engaged in singing and other musical activity.  (Tr.

98, 103, 106, 112, 123, 152, 279, 304, 307, 308, 314, 335).  On one form, which is undated, she wrote that she "use [sic] to perform professionally danced, sang, traveled.  Made a [sic] album I had totally given up ever wanting to sing/perform again.  Now that is my goal to go into the studio & record some of my original inspirational songs & make my C.D. & I would like to travel and sing to people who need hope!"  (Tr. 307).

On another form, dated November 19, 1998, Garcia-Logue stated that her recreational activities included writing songs and playing the guitar and piano.  She stated that she had written about 150 songs and that she liked to sing in church, as well as at jails and prisons (Tr. 314), adding, "All I do to keep my sanity is pray, go to church & sing, write songs, & ventilate my feelings like that!"  (Tr. 315).  On a form dated December 28, 1999, under "Recreational Activities and Hobbies," she wrote that she was working on the guitar and piano and had written 156 songs, which she had copyrighted.  She stated she was "pursuing a career to sing & perform."  (Tr. 321).

Counsel argues that the ALJ ignored "the medical significance of these grandiose and delusional statements."  [Doc. 14, at 11].  However, there is no professional medical opinion in the record that Garcia-Logue is delusional.  As noted above, her statement to the Hearing Officer that she was studying to work in the prepaid legal services field, but had not yet earned any money at it, is not particularly "grandiose."  There is nothing on the record to indicate that the Hearing Officer had any reason to believe that the statement was untrue.

Most of the information about Garcia-Logue's singing and songwriting activities indicate that she sees these activities more as recreation, therapy, and a way to help others, rather than as some delusional and unrealistic scheme to become a recording star.  She says she wants to make a CD of her songs that she can distribute it, at least, among family and friends.  She states that she would like

to record the songs she has written, and would like to travel and perform.  These goals do not seem so completely out of the range of the possible as to be delusional, and no doctor or other medical provider has said that they are.

While it appears likely that Garcia-Logue was exaggerating when she said she had a record contract and was planning to make and promote a CD, these statements reflect on her credibility rather than on her mental health or lack thereof.  Exaggeration and boasting are commonplace human conditions, and not necessarily any evidence of delusion.  Without some medical confirmation that Garcia-Logue is delusional, the Court cannot say that the ALJ erred in taking her musical activities into account in finding that she is not disabled.

Counsel also points to medical evidence of manic behavior on Garcia-Logue's part and says that this evidence, taken together with the grandiose statements, is sufficient to trigger the ALJ's duty to further develop the record.  In support of the contention that Garcia-Logue exhibits manic symptoms, he cites the medical records of therapist Claudia Johnson and Dr. Ben J. Klein.

In her notes of treatment of Garcia-Logue, in a section headed "manic behaviors," Ms. Johnson checked off only one category –  "racing thoughts" – and left unchecked other types of manic behaviors listed on the form.  Under "diagnoses," she listed anxiety disorder and agoraphobia and major depression; there is no mention of manic syndrome or bipolar disorder.  (Tr. 455, 459).  In her narrative notes of office visits, Ms. Johnson wrote that Garcia-Logue "tends to engage in long tangential stories only loosely related to the original question," that her speech is pressured and rapid, and that she has difficulty staying focused.  (Tr. 460-461).  Ms. Johnson saw Garcia-Logue for only a few visits over a two-month period, and she never made a diagnosis of a manic disorder.

Ben J. Klein, who is a Ph.D. and presumably a psychologist, saw Garcia-Logue on one

occasion in July 2001.  He wrote that she reported her medical history in a "rather disjointed" fashion (Tr. 15), and that her "appearance is notable for the fact that she sits in a rather stiff posture and appears tense and anxious."  (Tr. 16).  He diagnosed Garcia-Logue with "pain disorder with physical and psychological factors contributing"; there is no mention of a manic behavior disorder.  (Id.).

The record does not support a finding that Garcia-Logue suffers from manic behavior, nor that she exhibits delusional thinking rising to the level of a mental disorder.  The Court rejects the contention that the ALJ failed to develop the record in this regard.

### 3.  _Consideration of Ability to Work on a Sustained Basis Absent Alcohol Use_

In determining RFC, the ALJ must make a finding as to whether the claimant has the ability to perform work activity on a regular and continuing basis.  20 C.F.R. §§ 416.945(b). In assessing a claimant's mental abilities for purposes of determining RFC, the ALJ is to "assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 416.945(c).  The regulation continues:  "A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work."  Id..

Garcia-Logue contends that the ALJ erred in finding that she has the emotional ability to perform work on a sustained basis.

The ALJ in this case found that "the claimant now has the residual functional capacity to perform the full range of light exertional level work."  (Tr. 628).  As to Garcia-Logue's alcohol abuse and its effect on Garcia-Logue's ability to work, the ALJ said this:

> In the present case, the claimant has impairments due to alcohol abuse with alcohol related seizures and chronic back pain which are severe and an impairment due to depression which is not severe, considered separately or in combination . . . .   Upon consideration, the undersigned finds that during those periods when the claimant is using alcohol, she does not have the ability to maintain a regular work day or work week . . . .   [I]t is the claimant's alcohol abuse and resulting seizures which would prevent her from engaging in substantial gainful activity.  If the claimant were to stop using alcohol, she would be capable of performing light exertional level work.

(Tr. 628).  The ALJ found that Garcia-Logue was therefore not disabled.

This finding was based on 20 C.F.R. § 416.935(a), which provides that medical evidence of drug addiction or alcoholism requires a determination whether the substance abuse problem "is a contributing factor material to the determination of disability."  In making this determination, "[t]he key factor . . . is whether we would still find you disabled if you stopped using drugs or alcohol."  20 C.F.R. § 416.935(b).  The regulations direct the ALJ to evaluate which of the claimant's physical or mental limitations would remain if she stopped using alcohol, and then determine whether any of the remaining limitations would be disabling.  If the remaining limitations would not be disabling, then the ALJ must find that the alcoholism is a contributing factor.

In this case, the ALJ found that Garcia-Logue's asserted physical limitations were "greatly exaggerated," and that she engages in extensive activities which suggest the ability to perform light work.  (Tr. 629).  With respect to the evidence of Garcia-Logue's mental limitations and her history of alcohol abuse, the ALJ pointed to medical records mentioning psychological or psychiatric care, the consultative psychiatric evaluation performed by Dr. Rene Gonzalez in 1999, and medical records which demonstrated a severe problem with alcohol.

In making the assessment that Garcia-Logue has the emotional and psychological capacity to

work when she was not engaging in alcohol abuse, the ALJ pointed to Dr. Gonzalez's report.  He recited the following from the report:  Garcia-Logue reported being depressed due to her multiple physical problems and due to the recent death of her boyfriend from a cocaine overdose.  Garcia-Logue told Dr. Gonzalez that she had not herself used cocaine herself since 1992 but was drinking alcohol heavily.  On mental status exam, Garcia-Logue's mood appeared to be sad and depressed.  There was no evidence of any thought disorder.  Her concentration and attention appeared to be mildly impaired, but she was alert, pleasant and oriented.  Her memory was intact.  The doctor diagnosed major depression, recurrent episode, and alcohol abuse.  Garcia-Logue told Dr. Gonzalez that it was her physical condition, rather than her mental condition, which rendered her unable to work.  The doctor concluded that, emotionally, Garcia-Logue could relate well to others and would be able to hold a job.  (Tr. 625-626).

This recital in the ALJ's opinion, as described above, is borne out by the record.  (Tr. 369-372).  In addition, Dr. Gonzalez found that Garcia-Logue was able to take care of her basic activities of daily living and to handle her own finances.  She displayed some symptoms of depression but was not psychotic.  She was able to remember and understand basic instructions.  The doctor concluded, "From the emotional point of view, she is able to handle a job.  She is able to relate well to others." (Tr. 371).  Dr. Gonzalez recommended that Garcia-Logue receive further therapy and noted that she might benefit from a trial of an antidepressant.  The doctor's concluding prognosis was:  "Good from the psychiatric point of view."  (Tr. 372).

Garcia-Logue does not point to any specific evidence on the record tending to show that, even if she abstained from alcohol, her mental impairment would prevent her from working on a sustained basis.  The history of Garcia-Logue's treatment for alcohol-related medical problems is as follows:

In January of 1998, she was treated at Lovelace for strep throat, and the doctor noted she had alcohol on her breath.  (Tr. 396).  On April 21, 1999, she presented to the ER with complaints of severe abdominal pain, nausea and vomiting.  She reported having had "one beer and one miniature tequila" that day, to ease the pain.  (Tr. 342).  The doctor noted a "strong odor of alcohol about her." (Tr. 343).  She was diagnosed with alcohol intoxication and was discharged home with medications for her gastric condition and a warning not to drink alcohol.  (Tr. 344).

On June 29, 1999, Garcia-Logue again came to the ER with multiple physical complaints including a sore throat, a feeling of weakness, and swelling in her face and neck.  She smelled of alcohol.  She reported excessive alcohol intake over the preceding several weeks, which she said she was using to kill the pain in her throat.  The doctor felt that the bloating on her face and neck were caused by excessive drinking.  He advised her to stop drinking and allow a couple of days for the swelling to go down.  He also concluded that her alcohol intake "makes her anxiety somewhat worse."  (Tr. 361).

In January of 2000, Garcia-Logue sought help for her alcoholism addiction with a doctor in Missouri.  She went through a detox program and was placed in an out-patient program there.  (Tr. 441-443).  On April 13, 2000, Garcia-Logue told the doctor at a consultative physical examination that she had been sober for 78 days.  (Tr. 399-400).  In June 2000, she told her doctor that she had not used alcohol for the past five months and that she felt great.  (Tr. 497).  In October 2000, her doctor noted that she had been off alcohol for nine months.  (Tr. 492).  On March 22, 2001, she told her therapist that she had been abstinent from alcohol for one year and two months.  (Tr. 455).  In July 2001, she was evaluated for pain management treatment and told the provider that she did not use alcohol.  (Tr. 15).

29

It appears that Garcia-Logue remained abstinent for a period of time but then relapsed into alcohol use, with severe consequences. On April 8, 2003, she was brought to UNMH by her mother. She complained of difficulty breathing, tremors, anxiety, and stabbing chest pain. She had a generalized seizure in the ER and was given anticonvulsant medication. She was diagnosed with alcohol withdrawal seizures and *delirium tremens* and was admitted to the hospital for approximately eight days. As noted above, Garcia-Logue told the examining physician at this visit that she had a history of a seizure disorder since the time she was a child; however, Garcia-Logue's mother contradicted this, telling the doctor that her daughter never had seizures before. Garcia-Logue stated that she had been sober for three years and joined the Sobriety Society, but then relapsed and started to drink again approximately three years earlier. The discharge diagnosis for this visit was alcohol withdrawal seizures and *delirium tremens*. Garcia-Logue she was referred to a rehab program. (Tr. 683-695).

On October 7, 2003, Garcia-Logue was again brought to UNMH, this time by her boyfriend who had found her on the floor shaking with tremors and foaming at the mouth. The record of the ER visit includes the information that Garcia-Logue started drinking again about one month previous to the admission and had been drinking heavily for two weeks. She experienced two seizures in the ER and was admitted to the hospital for overnight treatment. (Tr. 725-728).

Garcia-Logue returned to UNMH for follow-up treatment on October 14, 2003. At that time, she reported that she was doing well and had been abstinent from alcohol, "except that one day she had two Coronas when at her apartment." (Tr. 721). She agreed to attempt to be completely abstinent from alcohol. (Id.).

On November 26, 2003, Garcia-Logue returned to UNMH complaining of nausea and

vomiting for the preceding five days.  She also said she had experienced "almost daily seizure activity over the past month."  (Tr. 718).  She told the doctor that since her discharge from the hospital in October, she used alcohol approximately three times, and each time she drank 'as much as I could.'" (Id.).

From January 2000 until April 2003, it appears that Garcia-Logue was sober and abstinent from alcohol.  During this period, she continued with her musical activities, attended church regularly, and counseled and entertained at prisons.  There is nothing in the record to indicate that during this period of abstinence, Garcia-Logue suffered from mental impairments which interfered with activities of daily living, social functioning, or concentration, nor that she suffered repeated episodes of decompensation of extended duration.

Also during this period, Garcia-Logue had four sessions with therapist Claudia Johnson in March-April 2001, saw a Behavioral Pain Management specialist, and sought help from her doctor for stress and anxiety related to the deaths of three family members in December 2001.  While there is some indication that in 2001 Garcia-Logue used "pressured speech" and presented her medical history in a somewhat disjointed fashion, there is no other indication that, during her period of abstinence, Garcia-Logue suffered from mental impairments which would prevent her from working.

Garcia-Logue also argues that the Global Assessment of Functioning ("GAF") rating assigned to her by two different physicians establishes that she is unable to work.  Dr. Rene Gonzalez assigned Garcia-Logue a GAF score of 50 at the time of the consultative examination (July 1999) but gave her a score of 65 over the preceding year (Tr. 371).  Claudia Johnson assigned Garcia-Logue a score of

58 (Tr. 459).[7]

While a score of 58 is evidence of moderate impairment, and 50 is indicative of a severe

impairment, Dr. Gonzalez also stated that Garcia-Logue's emotional impairment would not prevent

her from working, as her thinking was normal, her memory was intact, her concentration and

attention were only mildly impaired, she could remember and understand basic instructions, and she

was able to relate well to others.  (Tr. 370-371).

In any event, a GAF score is not determinative in making an assessment of disability.  Camp

v. Barnhart, 103 Fed. Appx. 352, 354 (10th Cir. 2004) ("The score [*i.e.*, 50], without evidence that

it impaired Mr. Camp's ability to work, does not establish an impairment").  *See also*, Stalvey v.

Apfel, 242 F.3d 390 (Table, text in Westlaw), 2001 WL 50747, at *2 (10th Cir. Aug. 18, 1999) ("The

GAF [in that case, 55] is not an absolute determiner of ability to work. The ALJ properly considered

that score along with the rest of the medical evidence in reaching his determination that Ms. Stalvey

could perform light work"); Cainglit v. Barnhart, 85 Fed. Appx. 71 (10th Cir. 2003) (GAF scores of

---

[7]"The Global Assessment of Functioning (GAF) Scale is used to rate an individual's overall psychological, social, and occupational functioning . . . . The GAF scale ranges from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning . . . .  Each range can be described as follows: a GAF score in the range 31-40 indicates 'some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;' a GAF score of in the range of 41-50 indicates 'serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job);' a GAF score in the range of 51-60 indicates 'moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);' a GAF score in the range of 61-70 indicates 'some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships;' a GAF score in the range of 71-80 indicates, 'if symptoms are present, they are transient and an expectable reaction psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)).'" Lozada v. Barnhart, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004).

39 and 45; claimant found not disabled); Whelchel v. Barnhart, 94 Fed. Appx. 703 (10th Cir. 2004) (GAF score of 47; claimant found not disabled); Zachary v. Barnhart, 94 Fed. Appx. 817 (10th Cir. 2004) (GAF score of 45; claimant found not disabled).

The ALJ in the present case took into account the evidence of Garcia-Logue's GAF ratings, "along with the rest of the evidence" in making the RFC assessment.  Indeed, it would have been inappropriate if the ALJ had relied solely on the GAF.  Cf. Dawson v. Barnhart, 2006 WL 982005, at *2 (W.D. Va. Apr. 11, 2006) ("Dawson cites no cases or regulations suggesting that a GAF score below 50 is determinative of disability. In fact, courts have held that the GAF scale is intended to be used to make treatment decisions, and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score").  The Court finds no error in the ALJ's handling of the GAF score evidence.

The record supports the ALJ's finding that Garcia-Logue's alcoholism was a "contributing factor" in her inability to work on a sustained basis due to a mental impairment.

## II.
## Physical Impairment

As noted above, Garcia-Logue's new counsel added an additional argument in the reply brief, to which Defendant has responded in a surreply.  Claimant contends that, on remand, the ALJ failed to follow Judge Puglisi's specific directive to present to the VE "hypothetical questions that relate with precision all of the Plaintiff's impairments."  This statement was made in the context of Judge Puglisi's discussion of the medical evidence regarding the length of time that Garcia-Logue can sit and stand in a work day.

Judge Puglisi noted that ALJ Cole, at the 2001 hearing, posed a hypothetical question which

assumed that Garcia-Logue could sit for six hours per day.  This assumption was based on the

opinion of a non-examining agency physician, specialty unknown, who indicated that Garcia-Logue

could sit for six hours in an eight-hour day with normal breaks, and could stand or walk for two hours

per day.  The agency physician, Judge Puglisi wrote, did not explain why her opinion differed from

that of Dr. Toner, a consulting physician who examined Garcia-Logue.  The agency physician's

opinion was based on Dr. Toner's evaluation.  Dr. Toner, who specializes in occupational medicine,

found that Garcia-Logue could sit for only four hours per day, and could stand or walk for two hours.

(Tr. 665-666).

Judge Puglisi held that the ALJ erred in failing to explain why he did not credit Dr. Toner's

opinion regarding the four-hour sitting limitation.  He wrote:

> The vocational expert identified five jobs Plaintiff could perform,
> based on the assumption that she had the RFC to sit for six hours in
> an eight hour day, and for at least one job identified, would be able to
> have a sit-stand option.  Based on the present record, there is no
> indication as to whether a limit of four hours of sitting would affect
> the opinion of the vocational expert.  "Testimony elicited by
> hypothetical questions that do not relate with precision all of a
> claimant's impairments cannot constitute substantial evidence to
> support the [Commissioner's] decision."  [Citation omitted].
> Accordingly, I find that the testimony of the vocational expert does
> not provide substantial evidence upon which the ALJ could conclude
> that Plaintiff had the RFC for the jobs identified.

(Tr. 666).  Judge Puglisi found no error in the ALJ's handling of hypothetical questions with respect

to Plaintiff's mental impairments, and he affirmed the holding of non-severity as to such impairments.

(Tr. 666-668).

Upon remand following the court ruling, the Appeals Council vacated the earlier decision in

Garcia-Logue's case and remanded the case to an ALJ "for further proceedings consistent with the

order of the court." (Tr. 669). When a case is remanded by the Appeals Council for further proceedings by an ALJ, the ALJ may consider "[a]ny issues related to [the] claim . . . whether or not they were raised in the administrative proceedings leading to the final decision in your case." 20 C.F.R. § 416.1483. In addition, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 416.1477.

Garcia-Logue appears to argue that Judge Puglisi intended that, at a hearing on remand, the ALJ would pose a specific hypothetical question to the VE which would include the assumption that Garcia-Logue can sit for only four hours in an eight-hour work day. The ALJ did not specifically pose such a question, and Garcia-Logue contends that this was error and violated the "law of the case" doctrine.

The Court agrees with the government that Judge Puglisi did not specifically order the ALJ on remand to find a particular RFC or to pose any particular hypothetical. Instead, the judge directed that the ALJ was to conduct additional proceedings at step seven and include hypothetical questions relating with precision all of Plaintiff's impairments. (Tr. 668). The ALJ's inquiries were expected to include all – but only – those impairments supported by evidentiary record. Unless the reviewing court explicitly ordered the ALJ to include a four-hour sitting limitation as part of the claimant's RFC and to propound exactly that limitation to the VE, the ALJ was free to examine the entire record and consider "with precision all of Plaintiff's impairments" in determining the ultimate issue of continuing disability. Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995) ("it remains for the administrative tribunal, rather than this appellate court, to determine the factual extent of the impairment"); Whelchel v. Barnhart, *supra*, at 707 ("because he did not accept [certain findings made in earlier

35

proceedings], ALJ Evans was under no obligation to include those restrictions in any questions propounded to the VE").  Indeed, the only restriction on hypothetical questions is that there is some evidentiary support for each portion of the hypothetical.  While hypothetical questions must reflect with precision all of the claimant's impairments, they "need only reflect impairments and limitations that are borne out by the evidentiary record."  Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996).

This conclusion is in line with "law of the case" doctrine in the Tenth Circuit, which is applicable not only between courts of different levels, but also to judicial review of administrative decisions, including Social Security disability cases.  Grigsby v. Barnhart, 294 F.3d 1215, 1218 (10th Cir. 2002).  The court or agency to which a case has been remanded must comply with the mandate rendered by the reviewing court, but the Tenth Circuit holds that the "law of the case" rule is discretionary, not mandatory.  Grigsby v. Barnhart, supra, at 1219.  And when the mandate of the reviewing court is general, rather than specific, the agency is free to decide anything not foreclosed by the court.  Copart, Inc. v. Administrative Review Board, 495 F.3d 1197, 1201 (10th Cir. 2007).

In order to comply with Judge Puglisi's ruling, an ALJ utilizing a VE on remand would have to formulate a hypothetical question which included only those assumptions solidly and precisely grounded in record evidence.  The problem with the earlier hypothetical was that the ALJ did not explain why he rejected Dr. Toner's opinion as to a sitting limitation of four hours, and used instead the non-examining agency physician's opinion that Garcia-Logue could sit for six hours.  It is apparent that if the ALJ had included such an explanation in the earlier opinion, and if the explanation were reasonably grounded in law and fact, the ruling would have been upheld at the judicial level.

In questioning the VE at the hearing on remand in this case, the ALJ did not specifically mention a sitting limitation of four hours.  But the ALJ did not rely on any testimony of the VE in

finding that Garcia-Logue's disability ceased.  Instead, he reviewed the entire record and found that

Garcia-Logue was capable of performing a full range of light exertional work, absent alcohol abuse

(Tr. 632).  He then relied on the Grids in finding that she was not disabled.

This was not error.  The ALJ discussed at length the basis for his RFC finding as well as his

reasons for rejecting Dr. Toner's four-hour sitting limitation, including Dr. Toner's own finding of

positive Waddell's signs and other indications that Garcia-Logue was exaggerating her symptoms;

medical records which showed that back pain was not an acute or primary problem for her; the fact

that Garcia-Logue engaged in extensive activities consistent with the ability to perform light work;

and the fact that "the claimant told Dr. Toner that she could sit for only 20 minutes, but that she later

told another physician that she sometimes sat on her foot for long periods of time when she played

the guitar."  (Tr. 625, 627, 629-30).

The Court rejects Garcia-Logue's implied argument that Judge Puglisi made, in essence, a

finding of fact which was binding on the ALJ when the case was remanded.  There was no specific

order that a four-hour sitting limitation be utilized; rather the case was sent back with a more general

instruction that the ALJ must consider "with precision all of Plaintiff's impairments."   Without a

specific directive from the Court, the ALJ was entitled, and expected, to examine all issues relating

to the claim, whether or not they were raised or decided in the earlier administrative proceeding, 20

C.F.R. § 416.1483, and to proceed by "reviewing the record on remand, checking initial findings of

fact, and making corrections, if appropriate."  Campbell v. Bowen, 822 F.2d 1518, 1522 (10th Cir.

1987).  See also, Houston v. Sullivan, 895 F.2d 1012, 1015 (10th Cir.1989) ("Once the case was

remanded to the ALJ to gather more information about the extent of Houston's disability, the ALJ

was free to reevaluate the facts").  This is what the ALJ did, and his conclusions are supported by the

record.

## Conclusion

The ALJ in this case properly assessed the evidence and applied the appropriate standards in determining that Garcia-Logue's mental impairment would not prevent her from working, if she abstained from alcohol use.  The Court finds no error in the ALJ's analysis of anxiety disorder nor in his handling of the Psychiatric Review Technique.  His findings concerning mental impairment and ability to work on a sustained basis are supported by record evidence.

In addition, the ALJ was not bound by the Court's earlier ruling to use a four-hour sitting limitation in posing hypothetical questions to the VE regarding Garcia-Logue's physical impairments. The ALJ properly considered Dr. Toner's opinion in the context of all the evidence, and the ALJ's decision to discount that opinion was fully and adequately explained in his opinion.

## Recommended Disposition

That Plaintiff's Motion to Reverse or Remand Administrative Agency Decision [Doc. 14] be denied and the case be dismissed.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge